1:19MJ2275

## Affidavit in Support of Criminal Complaint

I, Rande Reinhard, a Special Agent with the Drug Enforcement

Administration ("DEA"), United States Department of Justice, being first duly

sworn, depose and state under oath as follows:

1.      This affidavit is made in support of a criminal complaint against

Jermaine BENNETT for knowingly and intentionally distributing a controlled

substance (cocaine, a schedule II controlled substance), in violation of Title 21,

United States Code, Sections 841(a)(1) and 841(b)(1)(C).  Because this affidavit is

submitted for this limited purpose, I have not included all facts known to

investigators.

2.      In sum, as set forth more fully below, on two separate occasions

between on or about November 5, 2019, and on or about November 19, 2019,

BENNETT sold cocaine to a Confidential Source ("CS").

### Training and Experience

3.       I am employed as a Special Agent with the DEA and have been so

employed since February 2008.  During my employment with the DEA, Affiant

has been assigned to the Detroit Field Division (DFD) in Detroit, Michigan and

the Cleveland District Office (CDO) in Cleveland, Ohio.

4.      Accordingly, I am an "investigative or law enforcement officer" of

the United States within the meaning of Title 18, United States Code, Section

2510(7), and am empowered by law to conduct investigations of, and to make

arrests for, violations of Title 21, United States Code, Sections 841, 843(b), and

846, as well as violations of Title 18, United States Code, Sections 1956 and 1957, and other federal law violations.

5.     Upon joining the DEA, I received approximately 20 weeks of training at the DEA Training Academy in Quantico, Virginia.  This training addressed the methods by which drug traffickers possess and distribute controlled substances; the manner and means in which they conceal and launder the proceeds from the distribution of controlled substances; the manner and means in which they protect their proceeds and their controlled substances; and the manner and means by which drug traffickers attempt to avoid law enforcement detection of their activities.  The controlled substances as to which this training applied included, but were not limited to, marijuana, cocaine, heroin, and methamphetamine.

6.     During my law enforcement career, I have participated in numerous search, seizure and arrest warrants pertaining to the seizure of all types of criminal evidence, such as illegal drugs, drug paraphernalia, drug records, drug proceeds, and evidence of other types of crimes and arrests of individuals involved in drug trafficking activities.  I have received training in the enforcement of drug laws, with an emphasis on drug trafficking and drug organizations.  I have participated in multiple drug cases, some of which have been Title III investigations, involving drug trafficking activities and have become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms

that are used to disguise the source and nature of the profits from their illegal drug dealings.

7.     During my law enforcement career, I have received hundreds of hours in specialized training in the enforcement of the drug laws, the investigation of drug trafficking and drug organizations, in drug recognition and terminology, interviewing techniques, financial/money laundering investigations, and the use of electronic surveillance. I have also participated in numerous drug-related investigations, involving the following types of drugs: heroin, cocaine and cocaine base, methamphetamine and crystal methamphetamine, and marijuana.  I am familiar with and have been involved in all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation and undercover operations.  I have participated in Title III investigations, including investigations involving Mexican national drug trafficking organizations and drug traffickers.

8.     From my participation in these investigations, I have become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings.  Based upon my training and experience, interviews conducted with defendants, informants, and other witnesses to, or participants in, drug trafficking and money laundering activity, I am familiar with the ways in which drug traffickers and money launderers conduct their business, including the

various means and methods by which drug traffickers import and distribute drugs, and the ways that drug traffickers and money launderers use cellular telephones, digital display paging devices, and calling cards to facilitate their activity. Drug traffickers and money launderers also use numerical codes and code words to conduct their transactions.  In my experience, drug traffickers and money launderers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their activities from law enforcement.  I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, but not limited to, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, and the use of off shore accounts.

9.      Similarly, I am aware that drug traffickers routinely use and have at their disposal multiple vehicles registered in fictitious names and/or the names of third parties.  In addition to concealing their drug trafficking activities, the use of vehicles in this manner is also an attempt to conceal assets from law enforcement in order to prevent the forfeiture of those assets.

10.     In addition, I have consulted extensively with other experienced agents regarding drug trafficking activities. As a result, the knowledge that I have obtained during my law enforcement career has been further informed by other law enforcement agents with experience conducting drug investigations.

**Sources of Information**

11.     I make this affidavit based upon: information that I have learned from discussions with other investigators; the review of written reports of investigations, arrests, and seizures; execution of arrest and search warrants; interviews of targets; and the review of a search warrant affidavit by state and local officers.

12.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

**Probable Cause**

13.     On November 4, 2019, TFO Dan Lajack received information from the Lake County Narcotics Agency (LCNA) that an LCNA Confidential Informant (the "CI") was in a position to make a controlled purchase of one ounce of cocaine from Jermaine BENNETT. The CI was cooperating with law enforcement in exchange for a positive recommendation regarding charges through the Lake County Sheriff's Office for Drug Possession. The CI had been a confidential informant for LCNA, and has been proven credible and reliable until presently, as discussed below. DEA had prior knowledge that BENNETT was involved in the distribution of cocaine and marijuana, and the CI substantiated this by making recorded phone calls and/or text messages to BENNETT that resulted in CI meeting with BENNETT and purchasing cocaine, as discussed herein.

14.     On the morning of November 5, 2019, TFO Lajack spoke with the CI, and the CI advised that BENNETT was calling the CI at that time.  TFO Lajack and the CI ended their call, and the CI spoke with BENNETT.

15.     Following the conclusion of the conversation between the CI and BENNETT, TFO Lajack and the CI spoke again. During this time, the CI advised that BENNETT indicated that he did not have a vehicle, and therefore the CI would have to come to BENNETT's residence to complete the transaction. BENNETT also said that he would text the CI his address.  The CI later forwarded TFO Lajack an address of "226 Barrington place east aurora,44202", which was provided to him/her from BENNETT as his address.  It should be noted, 226 Barrington Place East, Aurora, Ohio is the address for the leasing office which is a short distance away from BENNETT's residence at 240 Barrington Place East.

16.     At approximately 1:30 p.m. on November 5, 2019, investigators met with the CI in preparation of the controlled purchase. During this time, investigators searched the CI and his/her vehicle for contraband, and none was located.  SA Moses then transferred $1,300 in DEA pre-recorded buy money (or "OAF") to SA Blakely, who then transferred it to the CI.  At this time, SA Moses also took photographs of text messages between the CI and BENNETT, as well as the CI's call history showing his/her contact with BENNETT earlier on November 5, 2019.

17.    At approximately 1:43 p.m., in the presence of TFO Lajack, the CI made a recorded call to BENNETT, at his known number.  During the call, the CI confirmed that BENNETT was at home, and the CI would meet him there.

18.    At approximately 1:50 p.m., the CI began traveling towards BENNETT's residence, with investigators following.  At approximately 2:37 p.m., at a secondary meeting location, DEA Investigators again met with the CI. At this time, and in the presence of TFO Lajack, the CI placed another recorded call to BENNETT, at his known number.  During the call, the CI tried to clarify what unit he/she was to go to, and BENNETT explained that his townhouse was immediately to the left of the clubhouse, and that he would be outside to direct the CI to his door.  At approximately 2:40 p.m., the CI was outfitted with multiple audio and video recording/transmitting devices.  Moments later, the CI again began traveling towards BENNETT's residence, which DEA Investigators believed to be 240 Barrington Place East, Aurora, Ohio (hereinafter known as the "Target Location"), which is located inside The Residences at Barrington.

19.    At approximately 2:50 p.m., investigators observed the CI pulling into The Residences at Barrington.  Moments later, investigators observed the CI's vehicle parked in the immediate vicinity of the Target Location.  Shortly thereafter, investigators overheard, via audio transmitter, the CI speaking with BENNETT via phone and attempting to locate his apartment.

20.    Concurrently, at approximately 2:51 p.m., SA John Ferraraccio observed BENNETT standing outside the Target Location and waving to the CI. SA Ferraraccio then observed the CI and BENNETT entering the Target Location.

21.     At approximately 3:02 p.m., SA Ferrarracio observed the CI exiting the Target Location.  Moments later, the CI called TFO Lajack and confirmed that the transaction had been completed.  Investigators then followed the CI to a pre-determined meeting location where they took possession of a white powdery substance that appeared consistent with cocaine, and field-tested positive for the presence of cocaine, and appeared to be approximately one ounce of suspected cocaine. Lab testing later confirmed that the substance was 28.70 grams of a substance containing cocaine hydrochloride, which I know based on my training and experience is a distribution quantity of cocaine. Investigators also searched the CI and his/her vehicle for any additional contraband, finding none.

22.     During a post-buy debriefing, the CI's statements included the following: when he/she first entered the Target Location, the CI provided BENNETT with the $1,300 in OAF and then asked to use the restroom.  Upon coming out of the restroom, the CI said that BENNETT had two ounces of marijuana and two ounces of cocaine laid out on a table.  The CI said that BENNETT told the CI to pick one of the ounces of cocaine.  The CI said that after he/she chose one, the CI placed it in another bag and then weighed it.  The audio transmitter reviewed by investigators corroborated the CI's debrief.  After speaking with the DEA Investigators, the CI departed.

23.     On November 19, 2019, investigators met with the CI to attempt a second controlled buy of cocaine from Jermaine BENNETT. The CI would be attempting to purchase approximately 2 ounces of cocaine from BENNETT for approximately $2,600 in OAF.

24.     On this day, investigators met with the CI at a predetermined meeting location prior to attempting the controlled purchase. At the predetermined meeting location, Patrolman Combs searched the CI with negative results. Patrolman Combs searched the CI's vehicle with negative results. TFO Lajack equipped the CI with a body transmitter and digital recorder for the purposes of being monitored and recorded. TFO Wadlington provided the CI with $2,600 in OAF.

25.     Prior to meeting with investigators, the CI made cellular phone contact with BENNETT at his known number, to arrange the above-described controlled purchase. TFO Lajack also photographed several text messages between BENNETT and the CI. The CI also made several unrecorded cellular phone calls to BENNETT to also arrange the above described controlled purchase. The CI text and/or called BENNETT at his known number. Investigators could not record the above text messages and/or phone calls because the CI was not in the presence of law enforcement.

26.     At the predetermined meeting location, at approximately 1:45 p.m., the CI made a recorded cellular phone call to BENNETT at his known number to arrange the 2 ounce cocaine transaction. During this phone call, BENNETT and the CI agreed to meet at the Beachwood Place Mall in order to complete the drug transaction. Specifically, BENNETT instructed the CI to go straight to Avalon Spa and Salon, which is located inside the mall.

27.     Following the above recorded phone call, at approximately 1:56 p.m., the CI departed the predetermined meeting location and began driving to

the Beachwood Place Mall to meet BENNETT. Members of the DEA Cleveland conducted mobile surveillance on the CI the entire time the CI drove to the mall without ever loosing visual contact with the CI.

28.     At approximately 2:04 p.m., as the CI was driving to the mall, BENNETT called the CI. The CI did not answer the phone call. At approximately 2:17 p.m., the CI called BENNETT at his known number to inform BENNETT that the CI was pulling into the mall and ask where BENNETT wanted the CI to go.

29.     At approximately 2:20 p.m., the CI parked in the outside parking lot adjacent to Dillard's. The CI exited his/her vehicle and entered the mall via Dillard's. Patrolman Combs followed the CI on foot into the mall. Also inside the mall were TFO Giordano and SA Grimes watching the spa/salon. At approximately 2:23 p.m., Patrolman Combs observed the CI enter the spa/salon and meet with BENNETT. Patrolman Combs positively identified BENNETT inside the spa/salon. At this time, the CI gave BENNETT $2,600 in DEA OAF that was placed inside a brown paper bag. In return, BENNETT handed the CI the 2 ounces of purported cocaine inside a Dunkin Donuts paper bag. Patrolman Combs observed the CI meet with BENNETT.

30.     Following the exchange, the CI departed the spa/salon and began walking through the mall back to the CI's vehicle. On the walk back to the CI's vehicle, the CI stopped in the bathroom inside the mall. Inside the bathroom, the CI placed $200 in DEA OAF in his pants near his buttocks and a small amount of cocaine that was just purchased from BENNETT. It should be noted that the CI

only gave BENNETT $2,400 in DEA OAF when the CI was inside the spa/salon when the CI originally met with BENNETT. Patrolman Combs caught up to the CI after the CI exited the bathroom. TFO Giordano and Patrolman Combs followed the CI out the mall on foot. TFO Lajack picked up Patrolman Combs and followed the CI to a predetermined meeting location to complete paperwork and to debrief the CI regarding the controlled purchase with BENNETT.

31.    At the predetermined meeting location, TFO Lajack and TFO Wadlington took custody of the purported cocaine that was just purchased from BENNETT. TFO Wadlington weighed the purported cocaine on TFO Lajack's digital scale with a weight of approximately 49 grams. Patrolman Combs searched the CI and located the $200 in DEA OAF in the CI's pants near his/her buttocks. TFO Lajack then asked if the CI if he/she had any of the purported cocaine in his/her pants, and the CI stated there was. At this time, the CI retrieved said cocaine from his/her pants and handed it to TFO Wadlington, who then placed the cocaine into a DEA evidence bag. Patrolman Combs and TFO Wadlington searched the CI's vehicle with negative results.

32.    Following the above events with the CI, in order to arrest BENNETT, additional members of DEA Cleveland decided to return to the mall, where SA Grimes had maintained constant visual surveillance of BENNETT as he was getting his nails done by a nail technician. At approximately 3:15 p.m., TFO Jopek and TFO Lajack approached BENNETT inside the spa and informed him that he was being arrested. BENNETT complied with investigators. BENNETT was wearing shorts at the time of arrest. BENNETT informed

investigators that his sweat pants were next to the chair he was sitting in. In the sweatpants, left front pants pocket, was the brown Dunkin Donuts paper bag. TFO Lajack asked BENNETT about what was inside the paper bag, and BENNETT stated there was money in it. DEA Cleveland took custody of the bag, which contained $2,400 of the pre-recoded OAF that had been provided to the CI.

33.    At approximately 3:16 p.m., TFO Jopek advised BENNETT of his *Miranda* Rights. BENNETT stated he understood his rights. After this, BENNETT was handcuffed and walked outside the business. TFO Lajack asked BENNETT if he was willing to speak to investigators regarding the sale of cocaine, but BENNETT declined to speak with investigators and requested an attorney.

34.    BENNETT's girlfriend was also inside the spa at the time of the arrest. She was identified by investigators as Person 1. Investigators learned from her that she and BENNETT both live in Aurora and drove to the mall in a red Hummer that was parked outside in the parking lot. Patrolman Combs asked Person 1 for consent to search the Hummer, which she verbally granted.

35.    At approximately 3:30 p.m., a search was conducted on the Hummer, bearing Ohio Registration HPW 6448. The search revealed the recovery of approximately 1 pound of suspected marijuana (later confirmed to be marijuana by forensic lab tests). Based on my training and experience, I know that this was a distribution quantity of marijuana.

36.    Investigators confirmed the money recovered from BENNETT matched the previously recorded DEA OAF. During his arrest, BENNETT stated

to Ptl. Combs that inside of his red hummer there was a bag of marijuana. At the jail intake, BENNETT provided his known number as his cell phone number.

37.     Subsequent lab tests confirmed that the quantities of suspected cocaine seized from the CI on November 19, 2019 were cocaine: 46.07 grams of a substance containing cocaine hydrochloride in the substance turned over as purchased from BENNETT, and 8.65 grams of a substance containing cocaine hydrochloride in the substance the CI initially attempted to conceal from investigators.  Based on my training and experience, these are distribution quantities of cocaine.

38.     Based on the information outlined in this affidavit, as well Affiant's training and experience, Affiant believes that Jermaine BENNETT is a drug trafficker, and BENNETT distributed cocaine to the CS on two occasions in November 2019.

*(Remainder of Page Intentionally Left Blank)*

## Conclusion

39.     Based upon the evidence and the facts set forth in this affidavit, I submit that there is probable cause to believe that, on or about November 5, 2019, and on or about November 19, 2019, in the Northern District of Ohio, Eastern Division, Jermaine BENNETT knowingly and intentionally distributed cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

Further Your Affiant Sayeth Not

_____
Rande R. Reinhard Jr.
Special Agent
Drug Enforcement Administration

Sworn to via telephone after submission by reliable electronic means on this day, _____December 12, 2019_____.
*See* Fed. R. Crim. P. 3, 4(d), and 4.1.

_____
David A. Ruiz
U.S. Magistrate Judge